**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MINDY GINSBERG, *

*Plaintiff*, *

v. * Civil Action No. RDB-26-2733

FR CONVERSIONS, LLC, *

*Defendant*. *

* * * * * * * * * * * * *

# MEMORANDUM ORDER

In this employment action, Plaintiff Mindy Ginsberg ("Plaintiff" or "Ms. Ginsberg") raises state and federal claims against her former employer, Defendant FR Conversions, LLC ("Defendant" or "FRC"). *See* (ECF No. 1 ¶¶ 56–123). Ms. Ginsberg worked for FRC as a salesperson at varying levels between 2012 and December 1, 2025, when her position as Executive Vice President of Sales ("EVP") was eliminated. (*Id.* ¶ 7, 23). In connection with the elimination of her position, FRC tendered to Ms. Ginsberg a "Notice of Position Elimination" which provided that FRC would pay Ms. Ginsberg any residual sales commission she was due under a Salesperson Agreement executed between Ms. Ginsberg and FRC in 2017 (the "2017 Salesperson Agreement"). (*Id.* ¶¶ 23–25). The 2017 Salesperson Agreement also set forth certain restrictive covenants that would restrict Ms. Ginsberg from working for FRC's customers or competitors for a period of two years after her departure from FRC. (*Id.* ¶ 41). Ms. Ginsberg now alleges that the restrictive covenants in the 2017 Salesperson Agreement, which have prevented her from obtaining comparable employment since December 2025, are unenforceable under Maryland law. (*Id.* ¶¶ 41–49; 56–63).

On July 10, 2026, Ms. Ginsberg initiated this action by filing in this Court a ten-Count Complaint (ECF No. 1) alleging against Defendant state law claims for breach of contract, breach of Maryland's Wage Payment and Collection Law ("MWPCL"), MD. CODE ANN., LAB. & EMPL. §§ 3-501 *et seq.*,[1] religious discrimination, and unjust enrichment, along with federal claims for declaratory relief and breach of fiduciary duty under the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Four days later, on July 14, 2026, Ms. Ginsberg filed a Motion for a Preliminary Injunction (ECF No. 5) seeking to enjoin enforcement of the restrictive covenants contained in the 2017 Salesperson Agreement.

Presently pending before this Court is Ms. Ginsberg's Motion for a Preliminary Injunction (ECF No. 5).[2] The Court has reviewed the parties' submissions and heard argument at a hearing on October 27, 2026. For the reasons set forth on the record at the conclusion of that hearing and expounded upon below, Plaintiff's Motion for a Preliminary Injunction (ECF No. 5) is GRANTED with respect to the non-compete and customer non-solicitation provisions. Defendant is hereby ENJOINED from enforcing those provisions of

---

[1] In her Complaint (ECF No. 1), Ms. Ginsberg pleads her claim under the MWPCL (Count III) in the alternative to Counts VII and VIII, which she brings under New York's Labor Laws. (ECF No. 1 at ¶¶ 69–72; 95–106). As neither party disputes the application of Maryland law to Count I of Ms. Ginsberg's Complaint, this choice-of-law issue is not yet before the Court, and the Court expresses no judgment as to the law applicable to Plaintiff's wage claims under Counts III, VII, and VIII.

[2] Also pending is Ms. Ginsberg's Motion for Partial Summary Judgment and Entry of Declaratory Relief as to the Enforceability of the Challenged Restraints in Count I (ECF No. 30). The Court acknowledges that, at an informal telephone conference held on September 11, 2026, the Court indicated that it would hear argument on Plaintiff's request for injunctive relief as well as any related request for a declaratory judgment. *See* (ECF No. 27). However, given that this case is still in the very early stages of discovery and significant issues remain for this Court's adjudication, the Court indicated on the record that it would render a decision on Plaintiff's Motion for a Preliminary Injunction (ECF No 5) and defer decision on Plaintiff's requests for declaratory relief until a later, more appropriate time.

the restrictive covenants in Section 8 of the 2017 Salesperson Agreement against Ms. Ginsberg.[3]

## BACKGROUND

Plaintiff Mindy Ginsberg ("Plaintiff" or "Ms. Ginsberg") alleges that she began working for Defendant FR Conversions, LLC ("Defendant" or "FRC") as a salesperson in 2012. (ECF No. 1 ¶ 7). FRC is a Maryland company engaged in the business of manufacturing wheelchair-accessible vehicle conversions for vans, ambulances, and other transport vehicles. (*Id.* ¶ 2). FRC does business throughout the United States and sells its conversion equipment to over 200 buyers nationwide. (*Id.* ¶ 45).

From the inception of Ms. Ginsberg's employment with FRC in 2012, she worked remotely from her residence in New York. (*Id.* ¶ 10). New York remained Ms. Ginsberg's primary sales territory for the duration of her employment with FRC, though she occasionally made trips to FRC's Maryland facility every few months. (*Id.*). Ms. Ginsberg remained employed by FRC for the next fourteen years, eventually working her way up to Executive Vice President of Sales ("EVP") in 2025. (*Id.* ¶¶ 13, 30).

In July 2017, approximately five years into Ms. Ginsberg's employment, FRC and Ms. Ginsberg entered into a Salesperson Agreement (the "2017 Salesperson Agreement"). (*Id.* ¶ 8). The 2017 Salesperson Agreement, among other things, outlined Ms. Ginsberg's assigned sales territory, modified Ms. Ginsberg's compensation structure from a strictly commission-

---

[3] As explained on the record and further below in this Order, the Court's injunction extends only to the provisions restricting Ms. Ginsberg's employment with FRC's competitors (the "non-compete provision") and customers (the "customer non-solicitation provision"). FRC is not enjoined from enforcing the restrictive covenant preventing Ms. Ginsberg from soliciting FRC's employees for a period of two years following the end of her employment with FRC.

based model to a salary-plus-commissions model, and set forth certain restrictive covenants that would apply to Ms. Ginsberg in the event that she separated from FRC. (*Id.*); *see also* (ECF No. 1-2 ¶¶ 3, 6). Ms. Ginsberg's assigned sales territory under the 2017 Salesperson Agreement was formally limited to eight states; however, over the course of her employment with FRC, she developed meaningful sales relationships in an additional seventeen states, making her true sales territory approximately twenty-five states total. (ECF No. 1-2 ¶ 6).

Ms. Ginsberg's sales performance was strong for the duration of her employment with FRC. (ECF No. 1 ¶¶ 9, 12). She received multiple promotions and compensation increases over the years, including a 75% salary raise in February 2025 from $100,000 to $175,000. (*Id.* ¶ 12). Ms. Ginsberg's sales achievements culminated in her June 2025 promotion to EVP of Sales, the most senior sales position available at FRC. (*Id.* ¶ 7). In addition to receiving a salary from FRC, Ms. Ginsberg also consistently received substantial commissions from the sales she executed on behalf of FRC. (*Id.* ¶ 9). In 2023, Ms. Ginsberg earned approximately $90,000 in base salary along with approximately $214,900 in commissions, and in 2024, Ms. Ginsberg earned approximately $100,000 in base salary along with approximately $231,600 in commissions. (*Id.*). Similarly, in connection with her promotion to EVP of Sales, FRC's CEO executed a Bonus Eligibility Letter which made Ms. Ginsberg eligible for a performance bonus of up to 35% of her base salary. (*Id.* ¶¶ 13, 31). Even after Ms. Ginsberg's promotion to EVP of Sales, she continued to personally generate the highest annual sales volume of any other salesperson employed by FRC. (*Id.* ¶ 9).

On October 31, 2025, approximately four months after Ms. Ginsberg's promotion to EVP of Sales, FRC issued to Ms. Ginsberg a Notice of Position Elimination (the "Notice")

which explained that her position as EVP of Sales would be eliminated effective December 1, 2025. (*Id.* ¶ 23). The Notice provided that the elimination of her role was part of "a limited reduction in force implemented to streamline certain operational and support functions and align leadership structure with the Company's long-term business objectives." (*Id.* ¶ 24). The Notice further provided that the Company would "honor any residual commission due under Section 11 [of the 2017 Salesperson Agreement] for the twelve-month period following termination, in accordance with the agreement's terms." (*Id.* ¶ 25).

It is undisputed that, following Ms. Ginsberg's separation from FRC in December 2025, she also became subject to the restrictive covenants set forth in the 2017 Salesperson Agreement. (*Id.* ¶¶ 41–42); *see also* (ECF No. 10 at 3–4, 8). Specifically, Section 8(c) of the 2017 Salesperson Agreement contains three restrictive covenants, one of which restricts Ms. Ginsberg's employment with FRC's competitors (the "non-compete provision"), one restricting her solicitation of FRC's customers (the "customer non-solicitation provision"), and a third restricting her solicitation of FRC's employees (the "employee non-solicitation provision").[4] (*Id.* ¶ 41). The relevant language of the covenants is as follows:

> The Salesperson [Ms. Ginsberg] agrees that . . . for a period of two (2) years following its last performances of services for the Contractor [FRC] (irrespective of the cause of termination), it will not (a) directly or indirectly accept any work for, contract from, or employment with, any business, firm, person or entity which had been the customer of the Contractor or account with the Contractor during the two (2) years immediately preceding the date of [the Salesperson's] last services for the Contractor; nor will it (b) directly or indirectly solicit for employment any of the Contractor's Staff Members, Salespeople, or Representatives for itself or for any others. In addition[,] the Salesperson covenants and agrees that Salesperson shall not enter into or engage

[4] Ms. Ginsberg's Motion for a Preliminary Injunction (ECF No. 5) only seeks to enjoin FRC from enforcing the non-compete provision and the customer non-solicitation provision. Ms. Ginsberg does not seek to enjoin FRC from enforcing the employee non-solicitation provision. *See generally* (ECF Nos. 5-1; 30-1).

> in any business competitive with that of Contractor either as an individual or on his/her own account, or as a partner, officer, director, or Salesperson of another corporation or otherwise, for the duration of employment with the Contractor and for a period of (2) two years following termination of employment for any reason whatsoever.

(ECF No. 1-3 at 3–4).

Ms. Ginsberg alleges that the restrictive covenants have prevented her from accepting comparable employment since her separation from FRC because the breadth of the covenants excludes her from working in *any* role in the vehicle mobility conversion industry for a period of two years. (ECF No. 1 ¶ 42). FRC confirmed in deposition testimony that the language of the covenants would prevent Ms. Ginsberg from accepting a janitorial position with an industry competitor. (ECF No. ECF No. 30-10 at 139:2–12). According to Ms. Ginsberg, the covenants were drafted in connection with her formal sales territory which, under the 2017 Salesperson Agreement, only spanned eight states: New York, New Jersey, Connecticut, Rhode Island, Massachusetts, New Hampshire, Maine, and Vermont. (ECF No. 1 ¶ 43); *see also* (ECF No. 1-2 ¶ 6). Ms. Ginsberg asserts that between 2017 and 2025, her responsibilities grew beyond those eight states, and she eventually developed meaningful customer relationships with a total of eight dealer companies doing business in an additional seventeen states. (ECF No. 1 ¶ 43). Thus, Ms. Ginsberg contends that her total sales activity only touched approximately twenty-five states; however, she asserts that the restrictions imposed by the covenants are unreasonable because they are not limited to Ms. Ginsberg's actual sales territory but rather contain no geographic scope. (*Id.*).

Ms. Ginsberg further alleges that she has complied with the covenants since her separation from FRC in December 2025 to her own detriment. (*Id.* ¶ 47). According to Ms.

Ginsberg, her compliance has caused her to endure an economic loss of approximately $14,500 per month, and she was forced to move to New Jersey in January 2026 because she could no longer afford to maintain the New York residence that she occupied for the preceding eleven years. (*Id.* ¶¶ 44, 49). In addition to economic loss, Ms. Ginsberg alleges that she is suffering intangible harm by virtue of her exclusion from the industry that a later award of monetary damages could not remedy. (*Id.* ¶ 49). Specifically, Ms. Ginsberg contends that she loses professional standing, client relationships, career trajectory, and market relevance each month that she is unable to work in her chosen profession, and this loss of her earned goodwill is not a type of harm that could be later quantified numerically. (*Id.*).

In light of this perceived harm, Ms. Ginsberg sought release from the covenants during communications with FRC in February and May 2026. (ECF No. 5-1 at 13). However, discussions between the parties did not prove fruitful. (*Id.*). This lawsuit followed.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). In determining whether to issue a preliminary injunction, this Court must follow the test set forth by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which requires a showing that:

(1) the movant is likely to succeed on the merits;

(2) the movant is likely to suffer irreparable harm absent preliminary relief;

(3) the balance of equities favors the movant; and

(4) an injunction is in the public interest.

555 U.S. at 20; *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

A court cannot issue a preliminary injunction absent a "clear showing" that all four requirements are satisfied. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 979 F.3d 219, 226 (4th Cir. 2020), *rev'd on other grounds*, 2 F.4th 330 (4th Cir. 2021); *accord Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). The plaintiff "bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). Thus, a court need not address all four *Winter* factors if one or more factors is not satisfied. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).

Before a court issues injunctive relief under Fed. R. Civ. Proc. 65, the court may require the movant to provide "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. Proc. 65(c).

## ANALYSIS

Ms. Ginsberg has met the high burden of demonstrating that all four *Winter* factors weigh in her favor. Accordingly, as set forth on the record and explained further below, she is entitled to preliminary injunctive relief.

### I. Likelihood of Success

Ms. Ginsberg contends that the restrictive covenants preventing her from working for any of FRC's customers or competitors for a period of two years following the end of her employment are facially overbroad and thus unenforceable under Maryland law. *See* (ECF 5-

1 at 4–7). In Maryland, the relevant inquiry "is whether the particular restraint is reasonable." *Padco Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 606 (D. Md. 2002) (quoting *Ruhl v. F.A. Bartlett Tree Expert Co.*, 245 Md. 118, 225 A.2d 288, 291 (1967)). "The general rule [] . . . is that 'restrictive covenants in a contract of employment will be sustained if the restraint is confined within limits which are no wider as to area and duration than are reasonable for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public.'" *Id.* Stated differently, "a restrictive employment covenant will only be enforced if it meets four requirements: '(1) the employer must have a legally protected interest, (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose undue hardship on the employee, and (4) the covenant cannot violate public policy.'" *Seneca One Finance, Inc. v. Bloshuk*, 214 F. Supp. 3d 457, 461 (D. Md. 2016) (quoting *Medispec, Ltd. v. Chouinard*, 133 F. Supp. 3d 771, 773–74 (D. Md. 2015)).

In assessing the reasonableness of a particular restrictive covenant, the court "must first make a determination 'on the scope of each particular covenant itself.'" *Id.* "If the covenant is not overbroad on its face, 'the facts and circumstances of [the] case must be examined.'" *Id.* (quoting *Chouinard*, 133 F. Supp. 3d at 774–75). "A restrictive covenant is overbroad if it exceeds the limits of what is reasonably necessary to protect the employer's legally protected interest." *Id.* (citing *Deutsche Post Global Mail, Ltd. v. Conrad*, 116 Fed. App'x 435, 438 (4th Cir. 2004)). It is well established in Maryland that employers have a legally protected interest in "preventing departing employees from taking with them the customer goodwill they helped to create for the employer." *Id.* (quoting *Conrad*, 116 Fed. App'x at 438);

*see also Holloway v. Faw, Casson & Co.*, 319 Md. 324, 572 A.2d 510, 515 (1990) ("Persons in business have a protectable interest in preventing an employee from using the contacts established during employment to pirate the employer's customers."). Maryland law also recognizes that employers have a legally protected interest in preventing the dissemination of the employer's confidential information. *Becker v. Bailey*, 268 Md. 93, 299 A.2d 835, 838 (1973). On the other hand, "mere protection from enhanced competition is not a protectable interest," and a covenant will not be enforced where its "sole purpose is to prevent a company's employees from joining another company, thereby making the new company a more efficient competitor." *MCS Servs., Inc. v. Jones*, No. WMN-10-1042, 2010 WL 3895380, at *3 (D. Md. Oct. 1, 2010) (quoting *Holloway*, 572 A.2d at 515).

In this case, the non-compete and customer non-solicitation provisions in the 2017 Salesperson Agreement both extend for two years after Ms. Ginsberg's separation from FRC, contain no geographic scope, and do not limit the roles or positions that Ms. Ginsberg is restricted from accepting with an FRC customer or competitor. *See generally* (ECF No. 1-3 at 3–4). The practical effect of these two covenants is to prohibit Ms. Ginsberg from working in *any* capacity for *any* customer or competitor of FRC *anywhere* in the world for a duration of two years. These provisions are not limited to the work Ms. Ginsberg actually performed at FRC and are far wider in geographic scope than is reasonably necessary to protect the goodwill that Ms. Ginsberg may have created with FRC customers. Sweeping restrictions such as these must be looked at with scrutiny, and a review of this Court's decisions makes clear that Ms. Ginsberg is likely to succeed on the merits of her claim that the covenants are facially overbroad and thus unenforceable.

In *TEKsystems, Inc. v. Spotswood*, No. RDB-05-1532, 2005 WL 8174397, at *5–7 (D. Md. June 28, 2005), this Court considered whether to grant an injunction compelling Defendant Spotswood's compliance with two restrictive covenants held by his former employer, TEKsystems. The first prohibited Spotswood from competing with TEKsystems within a 50-mile radius of Spotwood's former TEKsystems office in Miami, while the second barred Spotswood from soliciting all of TEKsystems clients. *Id.* at *5–6. Both covenants extended for 18 months. *Id.* at *2. This Court granted TEKsystems' request for an injunction compelling Spotswood's compliance with the first covenant, noting the reasonableness of the covenant's geographic scope along with the irreparable harm to TEKsystems from the disclosure of its proprietary information—which had allegedly already occurred—compared to the absence of harm to Spotswood, who had since relocated to California. *Id.* at *5.

However, this Court denied TEKsystems' request for an injunction compelling Spotswood's compliance with the second covenant, finding that such a "blanket prohibition" on solicitation of all TEKsystems' clients went beyond what was reasonably necessary to protect TEKsystems' confidential information, particularly where Spotswood's sales activities were limited to Miami, Florida. *Id.* at *6–7. Notably, the Court reached this conclusion despite argument from TEKsystems that Spotswood had already "removed confidential information relating to an unspecified number of clients," because "the fact that Spotswood may have removed information from the TEKsystems' Miami office does not justify enjoining him from soliciting business with [the] 441 California TEKsystems' clients with which he had no contact [while employed by TEKsystems]." *Id.* at *7.

Five years later in *TEKsystems, Inc. v. Bolton*, No. RDB-08-3099, 2010 WL 447782 (D. Md. Feb. 4, 2010), this Court considered the enforceability of another restrictive covenant held by TEKsystems. The covenant prohibited Bolton, a former employee, from competing with TEKsystems within a 50-mile radius of his former TEKsystems office in New York City for a period of eighteen months after his separation. *Id.* at *5. At the outset, the Court found the covenant's 50-mile geographic scope reasonable, specifically highlighting the fact that although TEK maintained a global presence, "Bolton is not barred from working or even competing against TEK in any market outside of the immediate New York City area." *Id.* The Court also noted (i) the covenant's 18-month duration, (ii) Bolton's specialized skill set, (iii) the necessity of the covenants for protecting TEK's confidential information, and (iv) the absence of undue hardship to Bolton as additional factors favoring enforceability. *Id.* at *5–7. The Court ultimately upheld the covenant, granted summary judgment in favor of TEKsystems, and issued an injunction compelling Bolton's compliance for the duration of the covenant. *Id.* at *9–10.

These decisions align with other decisions of this Court concerning the enforceability of restrictive covenants under Maryland law. In *Padco Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 606–07 (D. Md. 2002), Judge Chasanow of this Court considered the enforceability of a restrictive covenant that prohibited Omdahl from working for Padco Advisors' direct competitors for a period of two years following his termination. Judge Chasanow found the covenant was reasonable, noting that although the covenant lacked a geographic scope, it only restricted Omdahl from working for *two specific investment firms* that sold the same unique

financial products as Padco, and Omdahl himself estimated he could obtain comparable employment with a non-competitor in approximately six months. *Id.* at 608.

Similarly, in *MCS Servs., Inc. v. Jones*, No. WMN-10-1042, 2010 WL 3895380, at *3 (D. Md. Oct. 1, 2010), Judge Nickerson of this Court considered the enforceability of a restrictive covenant that prohibited Jones from working for a competitor company in any capacity in any geographic area where MCS Services operates for one year following his separation. Judge Nickerson found that while the duration and geographic scope were reasonable, "the scope of the proscribed activity [was] not properly bounded" because it "prohibit[ed] Jones from working in *any* capacity with *any* company that competes or may compete in any way with MCS." *Id.* (emphasis added). Given that the covenant would "even prevent [Jones] from working in [a competitor's] mailroom," the covenant only served to "constrain[] the list of Jones' potential employers instead of targeting possible goodwill-thieving activities" and was thus not reasonably necessary to protect the customer goodwill Jones generated. *Id.*

The foregoing cases evince a general principle that, under Maryland law, a restrictive covenant lacking a geographic scope may be reasonable where it is "narrowly tailored to prohibit employment only with direct competitors doing the same type of work that the employee did for the former employer." *Bloshuk*, 214 F. Supp. 3d at 463. In this case, however, neither the non-compete nor the customer non-solicitation provision constrain the scope of proscribed activities to only those jobs which may implicate Ms. Ginsberg's knowledge of or experience in sales. Indeed, FRC's corporate designee acknowledged in deposition testimony that Ms. Ginsberg would not be permitted to go work as a janitor for a company that competes

with FRC. *See* (ECF No. 30-10 at 139:2–12). Working as a janitor could not conceivably implicate any aspect of Ms. Ginsberg's prior work as the senior-most sales executive for FRC.

The same reasoning holds true with respect to the customer non-solicitation provision. In *Bloshuk*, when considering the enforceability of a similar customer non-solicitation provision, Judge Titus of this Court aptly noted:

> The interest protectable by a non-compete provision is the goodwill that the *employee* creates with the customer while working for the employer. This guards against the risk that the customer will be loyal to the employee with whom he has a relationship, rather than the relatively impersonal employer. . . . If Ms. Bloshuk had no contact or communication with the [] customers, it is not possible for her to create goodwill with them on Seneca One's behalf. The non-solicit provision is therefore facially overbroad and cannot be enforced.

*Bloshuk*, 214 F. Supp. 3d at 465 (internal citations omitted). Here, too, it would not be possible for Ms. Ginsberg to exploit the goodwill she created with FRC's customers in her future endeavors if she never had contact with the customer during her employment with FRC. *See Spotswood*, 2005 WL 8174397, at *7. An FRC customer simply cannot follow Ms. Ginsberg to a competitor entity because of its prior relationship with Ms. Ginsberg if there was no prior relationship—and thus no goodwill—between Ms. Ginsberg and the customer to begin with. This logical conundrum demonstrates the sheer absence of a nexus between the restrictions imposed on Ms. Ginsberg and any legally protected interest on part of FRC.

For its part, FRC points to *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 638–642 (D. Md. 1998) (Williams, J.) in support of its contention that covenants lacking a geographic scope may still be reasonable under Maryland law. As noted above, FRC is correct that Maryland courts have upheld as reasonable covenants lacking a geographic scope where other words or phrases narrowed the covenants' breadth. *See Omdahl*, 179 F. Supp. 2d at 608; *Allegis Group, Inc. v.*

*Jordan*, No. GLR-12-2535, 2014 WL 2612604, at *6 (D. Md. Jun. 10, 2014) (finding absence of geographic scope was not unreasonable in part because scope of proscribed activity was limited to aspects of employer's business in which former employee actually performed work). In *Barton*, the absence of a geographic scope was mediated by the fact that the covenants only extended for six months, "only restrict[ed] Barton from . . . working for one of Intelus' few direct competitors," and left Barton able to work in the same industry for a non-competitor entity. 7 F. Supp. 2d at 642. Here, the covenants extend for two years, during which time Ms. Ginsberg would be excluded from the entire vehicle mobility conversion industry. *See* (ECF No. 30-10 at 341:1–342:20).

In sum, although FRC may have a legally protected interest in goodwill generated by Ms. Ginsberg during her employment with FRC, that interest does not justify the sweeping breadth of the covenants here. Similarly, although FRC claims an additional interest in protecting FRC's confidential information, other provisions of the 2017 Salesperson Agreement specifically impose confidentiality obligations on Ms. Ginsberg, which she does not challenge. *See* (ECF No. 30-1 at 16–17; ECF No. 43 at 6); *see generally* (ECF No. 1-3). Finally, it is worth noting that in all of the above-cited cases, the Court was tasked with assessing the covenant's enforceability *after* the covenant had allegedly been violated by the former employee. *See Barton*, 7 F. Supp. 2d at 638; *Omdahl*, 179 F. Supp. 2d at 606; *Spotswood*, 2005 WL 8174397, at *5; *Bolton*, 2010 WL 447782, at *9–10; *Jones*, 2010 WL 3895380, at *2; *Bloshuk*, 214 F. Supp. 3d at 460. Here, Ms. Ginsberg has adhered to the covenants for nearly one year, she initiated the present action on her own volition to obtain a declaration on the enforceability of the covenants, and FRC conceded in argument that there is no allegation Ms.

Ginsberg has violated the covenants since her separation. These facts suggest that the risk Ms. Ginsberg will disclose FRC's confidential information is quite low.

In light of the foregoing, the Court concludes that Ms. Ginsberg is likely to succeed on the merits of her claim that the non-compete and customer non-solicitation covenants are facially overbroad and thus unenforceable.[5]

## II. Irreparable Harm

Under the second *Winter* factor, the Court must consider the risk that the movant will suffer irreparable harm in the absence of preliminary injunctive relief. 555 U.S. at 20. The Fourth Circuit has recognized that "irreparable harm can include actual and imminent loss of good will or erosion of [a] customer base." *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 239 (4th Cir. 2025).

In this case, Ms. Ginsberg asserts that she is suffering irreparable harm by virtue of her exclusion from the vehicle mobility conversions industry. *See* (ECF No. 5-1 at 12–13). Specifically, Ms. Ginsberg contends that she built her career in this industry over fourteen years, and her inability to work in the industry in any capacity has caused harm to her professional standing, career trajectory, market relevance, and cultivated customer relationships which no monetary award could fully remedy. (*Id.* at 12). In addition to professional harm, Ms. Ginsberg alleges that she is suffering ancillary economic losses of

[5] The parties also briefed the issue of whether this Court may apply Maryland's blue pencil doctrine and "blue pencil," or remove, any unenforceable language from the covenants in lieu of striking them down as wholly unenforceable. *See* (ECF No. 5-1 at 8–10; ECF No. 10 at 13–14; ECF No. 30-1 at 18–20). Because the Court is considering the enforceability of the covenants in the context of a motion for preliminary relief, rather than adjudicating the enforceability of the covenants on the merits, the Court does not reach this issue. Whether and to what extent the blue pencil rule applies is a question more appropriately reserved for later in the proceedings.

approximately $14,500 per month due to her inability to accept comparable employment. (*Id.* at 12–13).

On the other hand, FRC contends that Ms. Ginsberg's eight-month delay in filing suit to challenge the covenants belies the notion that she is suffering truly irreparable harm. (ECF No. 10 at 15–17). In support, FRC cites *Quince Orchard Valley Citizens Ass'n, Inc v. Hodel*, 872 F.2d 75, 79–80 (4th Cir. 1989), a case in which the Fourth Circuit affirmed the district court's denial of a preliminary injunction in part because the plaintiff delayed filing suit for six months after the issuance of a permit allowing the challenged project to move forward. Though FRC is correct that a delay in seeking injunctive relief is probative of whether harm is truly irreparable, *see* (ECF No. 10 at 15), delay alone does not categorically dictate finding this factor weighs against the movant. Indeed, in *Hodel*, it was also significant that over $7.1 million was unnecessarily expended on the project sought to be enjoined during the nine-month delay, all or most of which "could have been obviated if Plaintiffs had diligently brought suit" as soon as the permit was issued. 872 F.2d at 79–80.

Here, Ms. Ginsberg waited approximately eight months from her date of separation to file suit challenging the covenants. (ECF No. 10 at 15–16). In the meantime, however, both parties agree that Plaintiff's counsel demanded release from the covenants twice, once in February 2026, and again in May 2026. (*Id.*); *see also* (ECF No. 5-1 at 13). Only after it became clear that FRC would not release her from the covenants did Ms. Ginsberg elect to file suit. This period of delay more appropriately reflects Ms. Ginsberg's attempts to avoid costly federal litigation than a lack of diligence on her part in seeking relief from the covenants.

Furthermore, the harm Ms. Ginsberg faces from the covenants is not speculative simply because FRC has not yet initiated an enforcement action. FRC's argument to the contrary misstates Ms. Ginsberg's arguments concerning irreparable harm. *See* (ECF No. 10 at 16). Ms. Ginsberg does not claim that she faces irreparable harm from the hypothetical risk that FRC will bring an enforcement action if she violates the covenants. Rather, Ms. Ginsberg claims she faces irreparable harm to her professional standing, career trajectory, market relevance, and customer relationships due to her continued exclusion from her chosen industry. (ECF No. 5-1 at 12–13). This is not a hypothetical risk. It is undisputed that Ms. Ginsberg has remained out of the industry since her December 2025 separation from FRC, and FRC itself conceded that the covenants prohibit Ms. Ginsberg from working even as a janitor for another industry player. *See* (ECF No. 30-10 at 139:2–12). The harm to Ms. Ginsberg's professional standing continues to accrue each day that she remains alienated from her chosen industry, yet under the covenants at issue here, this exclusion would continue for another thirteen months.

Although the Court acknowledges Ms. Ginsberg's eight-month delay in filing suit, the Court finds the delay justifiable in light of Ms. Ginsberg's attempts to resolve this dispute informally and avoid the costly burdens of federal litigation. Additionally, balanced against the harm continuing Ms. Ginsberg faces to her career from FRC's enforcement of the covenants, her delay is not fatal. Accordingly, the Court finds that Ms. Ginsberg has satisfied her burden of demonstrating irreparable harm under the second *Winter* factor.

### III. Balance of the Equities

Next, the Court must assess whether the balance of equities favors Ms. Ginsberg. *See Winter*, 550 U.S. at 20. Under this factor, Ms. Ginsberg must demonstrate that the harm she would suffer in the absence of preliminary injunctive relief "outweigh[s] the harm[]" to FRC from the issuance of an injunction. *PSEG Renewable Transmission, LLC v. Arentz Family, LP*, 185 F.4th 497, 514 (4th Cir. 2026) (quoting *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land Owned by Sandra Townes Powell*, 915 F.3d 197, 221 (4th Cir. 2019)).

This factor weighs decisively in favor of Ms. Ginsberg. As explained above, there is no real dispute that Ms. Ginsberg has not violated the covenants since they went into effect on December 1, 2025. *See* (ECF No. 5-1 at 14; ECF No. 10 at 16–17). In that time, Ms. Ginsberg has foregone employment in her chosen industry, causing her to sustain both economic harm and intangible harm to her professional standing. Furthermore, Ms. Ginsberg alleges that she has complied with the covenants even though FRC has failed to pay her the full amount of residual commissions she is owed under Section 11 of the same 2017 Salesperson Agreement. *See* (ECF No. 1 at 37–40; 66–79; 99–100); (ECF No. 5-1 at 14–15). Although that issue is not presently before the Court and remains only an allegation at this early stage, if true, this fact would tip the scales even further in Ms. Ginsberg's favor.

In contrast to the harm faced by Ms. Ginsberg, the only harm FRC credibly suggests it may suffer from an injunction is Ms. Ginsberg's hypothetical use of her knowledge of FRC's sales strategies at a competitor entity. However, as noted on the record at the October 27, 2026 hearing in this matter, FRC has already had the benefit of enforcing the covenants for nearly one full year, and separate provisions of the 2017 Salesperson Agreement impose

continuing confidentiality obligations on Ms. Ginsberg. *See* (ECF No. 19 at 1–2; ECF No. 30-1 at 16–17; ECF No. 43 at 6); *see generally* (ECF No. 1-3). Even if Ms. Ginsberg were to violate some other provision of the 2017 Salesperson Agreement in the future, FRC may then bring an enforcement action and seek to restrain Ms. Ginsberg's conduct. However, given her strict compliance with its mandates to date, the Court is of the opinion that this risk is quite low.

In sum, the Court finds that Ms. Ginsberg has met her burden of demonstrating that the balance of equities tips in her favor.

**IV. The Public Interest**

Finally, the Court must consider whether the issuance of an injunction is in the public interest. *Winter*, 555 U.S. at 20. Maryland law recognizes that "the public has an interest in the enforcement of reasonable restrictive covenants," so long as "employers do not restrict employees from earning a living and do not limit fair competition." *Spotswood*, 2005 WL 8174397, at *7 (quoting *Barton*, 7 F. Supp. 2d at 642). Maryland also expresses a public policy that employees have a right to their earned compensation which overrides contractual devices to the contrary. *See Medex v. McCabe*, 372 Md. 28, 39–40, 811 A.2d 297, 304–05 (2002) (discussing the legislative history of Maryland's Wage Payment and Collection Law and noting "[c]ontractual language between the parties cannot be used to eliminate the requirement and public policy that employees have a right to be compensated for their efforts").

Ms. Ginsberg contends that an injunction would serve both aspects of Maryland public policy. She asserts that an order enjoining enforcement of an overbroad covenant held by a party who is allegedly withholding her earned commissions vindicates both the public policies favoring only reasonable restraints on trade and payment for work already performed. (ECF

No. 5-1 at 16). On the other hand, FRC responds that the public interest would be served by continued enforcement of a lawful agreement which protects its confidential information, particularly because an injunction would disrupt the status quo and Ms. Ginsberg's harm can be redressed by a later award of monetary damages. (ECF No. 10 at 18–20).

The Court agrees with Ms. Ginsberg. As noted earlier in this Order, Ms. Ginsberg has met her burden of demonstrating that she is likely to succeed on her claim that the covenants at issue here do not reflect "reasonable" restraints on trade. Similarly, FRC's legitimate interest in the continued protection of its confidential information is appropriately vindicated by other contractual provisions which impose on Ms. Ginsberg continuing confidentiality obligations. Although an injunction may alter the status quo by permitting Ms. Ginsberg to seek employment with FRC's customers or competitors, the Court finds this inconvenience minimal given that FRC has received the benefit of her compliance for one year, and this "status quo" would cease to exist in thirteen months anyways absent court intervention. Finally, considering Ms. Ginsberg's credible allegations of harm to her professional standing and reputation, it is far from clear whether her injuries could be fully redressed by monetary damages. Accordingly, the Court finds that issuance of an injunction here is in the public interest.

## V. Security

Under Federal Rule of Civil Procedure 65(c), the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

At the hearing in this case, counsel for Ms. Ginsberg proposed that Ms. Ginsberg be ordered to post security in the amount of $1,000. Counsel for FRC noted no objection to this amount. In light of the fact that discovery has just commenced and ten claims remain for merits adjudication, some of which involve monetary disputes, the Court finds that Defendant's interests would be adequately protected by a bond in the amount of $1,000.

## CONCLUSION

For the reasons stated above, it is this 29th day of October 2026 hereby ORDERED that:

1. Plaintiff's Motion for a Preliminary Injunction (ECF No. 5) is GRANTED;
2. Plaintiff SHALL POST SECURITY in the amount of $1,000, which shall be held in FedInvest until the conclusion of proceedings;
3. Defendant is ENJOINED from enforcing the non-compete provision and the customer non-solicitation provision of the restrictive covenants contained in Section 8(c) of the 2017 Salesperson Agreement against Ms. Ginsberg; and,
4. The Clerk of Court shall transmit copies of this Memorandum Order to counsel of record.

/s/
Richard D. Bennett
United States Senior District Judge